**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **CHARLES MARTIN** | § | |
| **and ARDRE NEAL,** | § | |
| | § | |
| **PLAINTIFFS** | § | **CIVIL ACTION NO.** |
| | § | |
| **V.** | § | |
| | § | _____ |
| **TEAM INDUSTRIAL SERVICES, INC.** | § | |
| **and TEAMQUALSPEC** | § | |
| **DEFENDANTS.** | § | **JURY TRIAL DEMANDED** |
| | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**I.      Preliminary Statement**

1.      This is an employment lawsuit brought for discrimination and hostile work

environment based on race within 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

**II.     Parties**

2.      During all times mentioned in this Complaint, Plaintiffs, Charles Martin ("Martin")

and  Ardre Neal ("Neal") were and are still citizens and residents of the United States and Jefferson

County, Texas.  Plaintiffs are Black and were qualified for the positions that they held.

3.      During all times mentioned in the Complaint, Team Industrial Services, Inc., and

TEAMQUALSPEC, (collectively "Defendant"), was and is still an employer, engaged in an industry

affecting commerce.  Defendant may be served through its registered agent Corporation Services,

211 E. 7th Street, Suite 620, Austin, Texas 78701.

**III.    Jurisdiction**

4.      Jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

5.      Declaratory, injunctive & equitable relief is sought pursuant to 42 U.S.C. § 1981.

6.      Compensatory and punitive damages are sought pursuant to 42 U.S.C. § 1981a.

7.      Costs and attorney's fees may be awarded pursuant to 42 U.S.C. § 1981 and Fed.
R.Civ. P. 54.

**IV.    Venue**

8.      This action properly lies in the Eastern District of Texas, Beaumont Division,
pursuant to 28 U.S.C.§ 1391(b) because the unlawful employment practices were committed in this
judicial district.

**V.    Facts**

    **Charles Martin**

9.      Martin was employed by Defendant in or about 2012.  At the time of termination, he
held the position of Technician.  Martin received satisfactory performance evaluations during his
employment and had no disciplinary action in his personnel file.

10.     He did not receive a performance evaluation conducted by Scott Best (Caucasian),
who became his supervisor in 2016. Before the promotion of Best to Supervisor, Best and Martin
were both technicians.

11.     In early 2016, Best was promoted and became Martin's immediate supervisor.
Prior  to the promotion of Best to supervisor, Casey Simmons (Caucasian), was the supervisor of
Best and Martin.

12.     Defendant created different pay classifications and/or accounts under Best and
Simmons to justify not paying Martin and Neal a salary commensurate to their certifications and
experience.   Non-Black technicians who performed virtually  the same job duties  as Neal and

-2-

Martin were paid significantly more than Martin and Neal.  Many times, Martin and Neal had more certifications and experience than other non-Black technicians.  Still Defendant used this excuse to disguise discrimination on the basis of race. This was only a part of the racial disparity and atmosphere promoted and encouraged  by Defendant.

13.     When Best became Martin's supervisor, Best promised Martin a raise on multiple occasions but always had an excuse for not authorizing one.  On occasion, Martin's requests for a raise were simply ignored by Best.

14.     In or about November 2016, Martin was called into the office by Best and laid off. Best told him that he was being laid off because he had the least amount of seniority.  This reason was not true but pretext to race discrimination.

15.     Contrary to the explanation given by Best, Martin was not the technician with the least amount of seniority at the time of the layoff.  Morever since the layoff, Defendant has hired other employees.  Defendant has not called Martin back to work although it told Martin that he would be called back if business improved.  Based on information and belief, one new employee is Caucasian and the other is of mixed heritage and/or Black.  The Caucasian employee (Josh) has a confederate flag hanging outside his home.

16.     The reason a Black employee was hired after Defendant laid off Martin was because at the time of Neal's, Neal told Best that the reason he was being terminated was because he is Black.  Best did not deny this statement.  Therefore, Defendant in hiring a Black employee is attempting to cover-up the racially motivated termination of Neal and Martin to escape potential liability on race discrimination.

17.     Martin was discriminated against for his views on racial relationship in America.

While Martin did not speak as often as other  (which seemed to disturb Best), Martin would share his opinion to coworkers on news including the racial discrimination in America and the Black Lives Matter movement.  Best heard multiple conversations Martin had with co-workers about race relations and this seemed to make Best agitated with Martin.  Ultimately, Best terminated Martin because of his racial views and Best's racial animus against Black people.

**Ardre Neal**

18.     Neal was hired by Defendant in or about 2015.  His position at termination was a Technician.  At the time of his termination, he had more certifications than most of the other technicians.  He received a few write-ups for being late a few minutes and a write-up for allegedly sleeping on the job.  The sleeping on the job write-up was fabricated by Best.  This is supported by the fact that Defendant did not terminate him for sleeping on the job.  It stated it terminated him for tardy issues.  At no time did Neal sleep on the job.  On the few occasions that he was a few minutes late, Neal called-in and followed company procedures.  Two other technicians (non-Black) were frequently late but to Neal's knowledge were not written up nor were they terminated for repeatedly being late.  Even if Neal were tardy on a few occasions, Defendant did not follow its progressive discipline policy.  At no time was Neal placed on notice by Defendant that one additional tardy would lead to termination.

19.     Neal did not receive a performance evaluation, although he had worked for Defendant for more than a year at the time of termination.  Defendant is supposed to conduct performance evaluations annually.

20.     Neal like Martin, was not paid commensurate to his certifications and experiences.

When another technician (Caucasian) resigned, Best placed Neal in the employee's position but did not give him the same or similar wages.  When Neal asked for the same hourly wage of the replaced employee, Best told him that he could not do it because the Caucasian employee was paid under another account or had a different classification.  Best's explanation was pretextual and clearly a disguise to discriminate against Neal. Best finally authorized a raise after numerous complaints by Neal but still did not give Neal the same or near the same amount of those of his predecessor or other non-Black technicians with similar certifications and qualifications.

21.     The same week Martin was terminated, Neal was called in by Best and told that he was fired for being late.  Neal denied the few time he was late warranted termination.  He told Best he was not being fired because he was late but because he is Black.   Best did not deny this statement but expressed surprise that Neal had the courage make the statement.  Neal also told Best's Area Manager, Rex Toiche' (Caucasian), that Best had terminated him because he is Black.  Toiche' replied that he did not know what was going on but he was trying to work on other business matters. Toiche' did not care Neal believed his termination was racially motivated.

22.     Best, as supervisor, denied Neal overtime so non-Blacks could work overtime. There was no legitimate nondiscriminatory reason for denying him overtime.

**Racial Slurs and Derogatory Statements/Conduct by Defendant's Supervisors**

23.     Best's negative views about Black people were well-known around the company, especially to those in supervision or management.  Defendant did nothing to correct Best's racially charged conduct but permitted it to continue.

24.     Simmons, Best's predecessor as supervisor, frequently permitted Best to use racially derogatory terms in referring to Black people.  When Simmons heard the racially slurs by Best, he

-5-

would either participate in them, say them himself or laugh with Best.   Rather discipline Best, Simmons encourage to hostile work environment.   Defendant promoted Best to a supervisory position.

25.      As Supervisor, Best had toilet tissue with the pictures of President Obama on it. He used it when he blew his nose and when he went restroom.   This was conduct unbecoming of an employee and particularly an employee in management or supervision.   Management saw the toilet paper on his desk but said and did nothing.

26.       During most of his employment, Martin felt the racial atmosphere at the facility in which he worked but he remained silent for the sake of keeping his job.   When Best became his supervisor, the racial atmosphere grew worse.   As previously stated, it was clear to Martin and Neal that Best did not like Black people.   This was confirmed by Dark Babin (Caucasian), a former inspector, for Defendant who worked with or under Best and Simmons.

27.      Babin stated that he heard Best call Martin and Neal a "nigger" a voluminous number of times while Babin worked for Defendant.   According to Babin, Best called them a nigger as a peer and as their supervisor.   Although  Martin and Neal never heard Best refer to them as a "nigger," it was clear to them from other statements that Best did not view Black people positively.   Not only did Best call Martin and Neal niggers, he was referred to Black people in general as "niggers."

28.      Best also referred to Martin and Neal as "Mondays."   When asked the meaning of the term, Best  stated that Black people always call in on Monday and collect a government check that Caucasians as taxpayers had to ultimately pay.   He referred to Blacks as lazy and called Neal lazy all the time.   He did not refer to Caucasians in a derogatory way.

29.      Defendant knew that Best held racial view towards Black people but did

nothing to remedy it.  Instead, Best was promoted to supervisor for his actions.  To their knowledge, no Black employee has held a supervisory or management position in the department in which the worked.

30.     Defendant permitted a racially hostile work environment and race discrimination by failing to remove racial slurs or racial affiliations from the portable restrooms.  A picture of a monkey with Martin's father's picture with a bone over the monkey's head was the wall of a portable restroom.  It was removed after Martin said it was a picture of his father.  No investigation was conducted and no training was implemented on racial insensitivity.

31.     On door to another portable restroom was written "KKK."  The size of the KKK notation was very large for all to see.  Defendant managers, supervisors and employees used this restroom. However, the KKK notation was never removed.

32.     On an insulated pipe of a USX furnace read "nigger don't belong" was written in royal blue paint marker.  Simmons saw it because he asked Martin was he looking for someone with blue paint as Simmons and another Caucasian employee laughed at the incident.  Defendant left the racially derogatory statement on the pipe for approximately one week before it was finally removed. Martin was humiliated but learned to adapt to the racially toxic atmosphere to keep his job.  This incident was never investigated although a supervisor had knowledge of it.  No employees were trained or questioned.  The hostile work environment continued.  To date, HR has not provided training or racial insensitivity.   .

33.      Neal and Martin frequently saw the word "nigger" throughout the restrooms in the entire refinery.  At times,  new portable restrooms were installed because it was time for cleaning. However, to their knowledge Defendant never took it upon itself to remove the racially derogatory

slur, although many saw it.  Martin and Neal had to subject themselves to this humiliating feeling throughout their employment.  Other supervisor and manager used the restroom and did nothing to remove the racial derogatory comments and affiliation.  Only employees had keys to the portable restroom.  Martin and Neal feared if they did not go with the flow, they would be retaliated against, harassed even more and terminated.

34.     Best asked Neal repeatedly to whom he was voting for in the 2016 general election.  Neal stated it was a private matter and that he follows his mother's suggestions in voting.  Best told Neal that he was voting for Donald Trump.  Everyday conversation seemed be about Trump in 2016.  Many employees including Best frequently criticized President Obama and stated he was not born in America.  Neal believed these conversations were not a difference in political philosophy but were  racially charged.

35.     Jordan Williams, Caucasian, another technician would walk in the room and say to Neal and Martin, "what's up my Ninja?"  They never had any conversations about being ninjas but they believed called them "ninjas" in replace of "nigger."  Best heard this on more than one occasion but did nothing to correct it.

36.     Best told Neal that he did not like Mexicans.  Best's sister was married to a Mexican man.  Based on all the comments and conduct by Best, it was clear Best did not like Mexicans but he detested Black people even more.

37.     There may have been other incidents that were racially motivated but Martin and Neal cannot recall them at this time.  They reserve the right to add additional facts as they remember them.

38.     Defendant's reasons for not terminating Plaintiffs is only pretext, manufactured to

conceal Defendant's unlawful discrimination.   Defendant has gone as far as changing certain employment practices to justify its actions.

39.     If Defendant had not discriminated on the basis of race, Plaintiffs would have received a substantial pay increase as well as other employment benefits.

40.     Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs experienced and are now suffering and will continue to suffer irreparable injury from the treatment by Defendant unless Defendant reinstate Plaintiffs to their rightful position of Technician.

41.     Plaintiffs suffered, are now suffering, and will continue to suffer emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary losses as a direct result of Defendant's discrimination and hostile work environment.

42.     Plaintiffs will suffer future pecuniary losses as a direct result of the Defendant's discrimination.

43.     Defendant engaged in discrimination and harassment against Plaintiffs with malice or reckless indifference to Plaintiffs' rights under Section 1981.

**VI.     Cause of Action**

44.     Plaintiffs incorporate as if re-alleged paragraphs 1 through 43.

45.     Because race was a motivating factor in the decision to terminate Plaintiffs, Defendant wilfully violated Section 1981.

46.     Because race was a motivating factor in the decision to deny Plaintiffs pay equivalent to there certifications and experience, Defendant willfully violated Section 1981.

47.     Because race was a motivating factor in the decision to deny Neal overtime pay, Defendant willfully violated Section 1981.

48.     Because Defendant was fully aware of the racially hostile environment in which Plaintiffs worked but took no remedial measures to correct it,  Defendant's  willfully violation Section 1981.

**VII.    Prayer for Relief**

49.     Wherefore, Plaintiffs pray that this Court:

a.      declare the conduct engaged in by Defendant to be in violation of Plaintiffs' rights;

b.      enjoin Defendant from engaging in such conduct;

c.      reinstate Plaintiffs to their rightful position of Technician, or in lieu of reinstatement, order front salary and benefits for the period remaining until normal retirement;

d.      compensate Plaintiffs in back pay equivalent to their comparators with the same or similar certifications and experience;

e.      compensate Neal in back pay for overtime he was denied based on race;

f.      award Plaintiffs equitable relief of back salary and fringe benefits up to the date of termination and prejudgment interest for that entire period, or front salary and benefits accrual;

g.      award Plaintiffs compensatory and punitive damages of $5,000,000.00;

h.      award Plaintiffs costs and attorney's fees; and

i.      grant such other relief as it may deem just and proper.

Respectfully submitted,


        /s/   *Victoria Plante-Northington*
VICTORIA PLANTE-NORTHINGTON
Texas Bar No. 00798436
Federal Bar No. 21235
5177 Richmond, Suite 1140
Houston, Texas 77056
Telephone: (713) 526-2615
Facsimile: (713) 513-5175
Email: victoria@plantelawfirm.com

ATTORNEY-IN-CHARGE FOR PLAINTIFFS